FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ SEP 26 2006 ★
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
IN THE MATTER OF THE COMPLAINT OF
REEL ACTION CHARTERS, INC.,
as owner of a certain 1988 Henriques Boat Works
vessel, REEL ACTION, UNITED STATES COAST
GUARD NUMBER 929787 FOR EXONERATION
FROM LIABILITY

CV 05-1194

(Wexler, J.)

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

----------------------------------------------------------------X

APPEARANCES:

    NICOLETTI HORNIG CAMPISE & SWEENEY
    BY: DAVID R. HORNIG, ESQ.
    Attorneys for Plaintiff in Limitation
    Wall Street Plaza
    88 Pine Street, 7th Floor
    New York, New York 10005-1801

    GREGORY R. LAMARCA, P.C.
    Attorney for Claimant
    898 Broadway, Suite 2
    Massapequa, New York 11758

WEXLER, District Judge

    This is a proceeding commenced by Plaintiff in Limitation Reel Action Charters Inc., pursuant to 46 U.S.C. App. § 183, for exoneration of liability arising from an incident that occurred aboard a charter fishing vessel known as the "Reel Action." Claimant, Edward Houghton (" Claimant") seeks damages incurred as a result of personal injuries sustained while aboard the Reel Action on September 4, 2004. The case was tried before the Court on July 26-27, 2006. This constitutes the Court's Findings of Fact and Conclusions of Law.

1

# FINDINGS OF FACT

A. <u>The Parties</u>

1. Plaintiff in limitation is Reel Action Charters, Inc. ("Reel Action")

2. Reel Action is a corporation organized pursuant to the laws of the State of New York.

3. At all times relevant to this proceeding, the sole asset of Reel Action was a 44 foot fishing vessel known as the "Reel Action" (the "Vessel").

4. At all times relevant to this proceeding, the sole shareholder of Reel Action was Douglas Oakland.

5. The Vessel was offered as a charter fishing vessel and was made available for charter by individuals and groups.

6. Claimant Edward Houghton is an individual who was part of a four person group that chartered the Vessel for a fishing trip that was scheduled to take place on September 3, 2004.

B. <u>The Vessel</u>

7. The Vessel is a 44 foot Henriques sports fishing vessel. The Vessel has a main cabin area, also referred to as the "salon," which is located near its center. It also has cabins, located below the salon area, in which passengers can place their gear and sleep.

8. Among the trips routinely taken by the Vessel are trips to an area known as the "canyons." These canyon fishing trips are approximately 30-50 miles offshore.

9. When embarking on a fishing trip to the canyons, the Vessel typically leaves from the Shinnecock Inlet at approximately 5:30 A.M. Passengers on charter trips

often sleep in the Vessel's cabins during the trip out to the canyons and awaken to fish.

C. <u>The Captain of the Vessel</u>

10. At all times relevant to this proceeding, the Master of the Vessel was its captain, William Williams ("Captain Williams").

11. Captain Williams was licensed by the United States Coast Guard as a captain and captained the Vessel.

12. Captain Williams acted as Master of the Vessel for ten years prior to the purchase of the Vessel by Oakland in 2004. After Oakland's purchase of the Vessel (through the Reel Action corporate entity), Oakland employed Captain Williams to continue to act as Master of the Vessel.

13. As Master of the Vessel, Captain Williams was responsible for all decisions regarding the operation and navigation of the Vessel. In addition to overseeing the Vessel's crew and providing for its maintenance, Captain Williams had authority to make reservations for charter trips and accepting payments.

14. Decisions regarding the operation and navigation of the Vessel, including <u>inter alia</u>, deciding if weather conditions permitted particular trips, were within the authority of Captain Williams.

D. <u>The September 3, 2004 Fishing Trip</u>

15. The Vessel was chartered by a group of four individuals, including Claimant, for a fishing trip that was scheduled for September 3, 2004 (the "September 3 Trip").

16. The September 3 Trip was a fishing trip to the canyons, departing from the Oakland Marina located in Shinnecock, New York.

17. The three individuals (other than the Claimant) scheduled to take part in the September 3 Trip were: (1) Eric Johnson; (2) Dimitry Schidlovsky and (3) David Wiedmer. Claimant was a friend of Weidmer and was unacquainted with the other two passengers. Schidlovsky was acquainted with Weidmer and Johnson.

18. The September 3 Trip was Claimant's first trip on the Vessel. Weidmer had been on fishing trips on the Vessel approximately ten times prior to the September 3 Trip and continued to take fishing trips, along with his family, on the Vessel thereafter.

19. Arrangements for the September 3 Trip were made by Eric Johnson with Captain Williams.

20. Captain Williams was the Master of the Vessel on September 3, 2004. He was assisted on the Vessel, on that day, by his Mate, Mark DeCabia. Mark DeCabia is a Captain licensed by the United States Coast Guard.

21. Captain Williams was responsible for monitoring weather and sea conditions prior to all fishing trips and monitored the conditions on the morning of September 3, 2004.

22. Captain Williams' monitoring of weather and sea conditions on September 3, 2004 indicated that there were light and variable winds of five to ten knots with south to southwest swells of between four and five feet, which Captain Williams considered to be normal.

23. Captain Williams testified that upon his arrival at the Vessel for the September 3 Trip, there was "zero" wind (as evidenced by "limp" flags on the dock) and that

the bay was calm. Captain Williams considered these conditions and determined that they were favorable for embarking safely on the September 3 Trip.

24. Captain Williams testified that he advised his passengers that as the Vessel got outside of the inlet, there could be swells and that they were therefore to remain in the salon area of the Vessel until it had cleared the outer bar of the Shinnecock inlet.

25. Captain Williams' belief as to the possibility of swells was based upon his knowledge that there had been stormed in Bermuda or the Carribean two days prior to the September 3 Trip and that such swells were therefore possible. Captain Williams predicted that any such swell would be between four and five feet.

26. Captain Williams testified that he saw the predicted swells after departing the dock, traveling beyond the jetties and before reaching the outer bar. He further testified that the swells, of between four and five feet, were encountered approximately seven to eight minutes after departure. Captain Williams stated that the Vessel passed over these swells and that the Vessel never went up into the air as a result of navigating these swells.

27. Captain Williams testified as to the proper method of operation of a Vessel upon encountering swells. Specifically, he testified that it was appropriate to slightly increase speed and go over swells of the size encountered on the day of the September 3 Trip. This was the method employed by Captain Williams on that day.

28. Claimant offered no testimony as to the proper way in which to operate a vessel that encounters swells.

29. Captain Williams testified that after the Vessel cleared the third swell, he sent Captain DeCabia down to make sure that the food cooler did not fall and to tell the passengers that they could leave the salon area and go below to the cabin area.

30. DeCabia reported to Williams that a passenger was injured in the cabin area and Captain Williams went to investigate. Upon finding Claimant in the cabin, Captain Williams recalled asking him why he was there when he had been instructed to stay in the salon.

31. Captain Williams assisted other passengers in bringing Claimant up to the main area of the Vessel and helped to make him more comfortable. Williams also made the decision, upon encountering Claimant and his injury, to return to the dock to obtain proper medical treatment for Claimant. Upon returning to the marina, Captain Williams called 911 for emergency medical assistance for Claimant.

32. The Court finds that Claimant left the salon area for the cabin area before the Vessel encountered the swells and before DeCabia went below to check if the swells knocked over any food coolers.

33. Claimant testified that when the Vessel encountered what he described as waves, he was thrown about the cabin several times. He further testified that as a result of this experience he suffered severe injuries, including an injury to his knee.

34. Weidmer testified that he witnessed Claimant being thrown into the air and hitting his head on the ceiling of the cabin and being thrown down a number of times.

35. Claimant suffered injuries while in the cabin of the Vessel.

36. The exact time that the Vessel encountered the swells and Claimant sustained his injuries is unclear. Based upon the testimony, however, the Court finds that the Vessel departed from the marina between 5:30 and 5:45 A.M. and that it turned around and Claimant was removed, via ambulance, at some time between approximately 7:00 and 7:30 A.M.

E. Passengers' Testimony Regarding Conditions and the Incident

37. Schidlovsky testified that the winds were strong, but had signed a statement, one month after the September 3 Trip, indicating that the winds were light. He also testified that it was "bumpy" leaving the inlet. Schidlovsky described the swells as an "unexpected" surge, encountered within minutes of the Vessel's departure.

38. Claimant testified that DeCabia communicated the Captain's warning that the inlet might be rough, but stated that he was never told to remain in the salon area.

39. David Weidmer testified that he "vaguely" remembered being told to stay in the salon area "in the beginning."

40. Weidmer described the swells as a series of waves which according to Weidmer, repeatedly lifted the Vessel straight up into the air.

41. Weidmer testified that he believed that the Vessel had cleared the inlet when Claimant was thrown about the cabin.

42. The Court credits the testimony of Captain Williams and finds that he instructed his passengers to remain in the salon area at the beginning of the trip and to remain there until instructed that it was safe to proceed to the cabin area.

43. The Court finds that Captain Williams properly monitored the weather conditions on the morning of September 3, 2004 and made a reasonable decision to proceed with the trip.

44. The Court finds that Captain Williams had extensive experience in the operation of the Vessel and that he appropriately navigated the swells encountered on September 3, 2004.

45. The Court finds that upon learning of Claimant's injuries, Captain Williams made the prudent decision to return to shore and properly cared for Claimant.

## CONCLUSIONS OF LAW

1. The Limitation of Liability Act (the "Act") provides, in pertinent part, that the liability of an owner of a vessel for any loss incurred without the privity or knowledge of the owner shall be limited to the amount or value of the interest of the owner in the vessel. 26 U.S.C. § 183; see Kroemer v. Guglielmo, 897 F.2d 58, 59 (2d Cir. 1990); In re Cornfield, 365 F. Supp.2d 271, 276 (E.D.N.Y. 2004).

2. The exoneration and limitation provisions of the Act apply to pleasure crafts such as the Vessel. Kroemer, 897 F.2d at 59.

3. If the owner of a vessel lacks privity or knowledge of negligence or unseaworthiness that results in loss or damage, his liability cannot exceed the value of his ownership interest in the vessel. Such value is to be determined as the value of the vessel at the end of the voyage on which the loss or damage occurred. In re Moran Towing Corp., 166 F. Supp.2d 773, 774 (E.D.N.Y. 2001).

4. When determining liability, the court engages in a two step analysis. First, the court considers whether any act of negligence or unseaworthiness caused the

accident at issue. Moran, 166 F. Supp.2d at 775. After determining the issue of negligence, the court considers whether the vessel's owner had knowledge of that condition. Id.

5. The claimant bears the burden of proof on the issue of negligence or unseaworthiness. Cornfield, 365 F. Supp.2d at 276; Moran, 166 F. Supp.2d at 775. Once this burden is satisfied, the burden of proof shifts to the vessel owner to prove lack of privity or knowledge. Cornfield, 365 F. Supp.2d at 276; Moran, 166 F. Supp.2d at 775.

6. The elements required to prove negligence under maritime law are the same as those required under the common law. Cornfield, 365 F. Supp.2d at 276. Thus, Claimant bears the burden of proving duty, breach of duty and causation. Id.

7. Claimant here sought to proved that his injuries occurred as a result of negligence. Specifically, it was argued that, in light of the weather conditions, it was negligent to proceed with the September 3 Trip. Claimant also argued that Captain Williams failed to properly warn the passengers of the proper procedures to follow, failed to properly operate the Vessel when encountering swells, and failed to properly care for Claimant after he sustained his injuries.

8. The court rejects all Claimant's theories of negligence and holds that he has not sustained his burden of proving that any act of negligence caused his injuries.

9. In view of the fact that Claimant failed in sustaining his burden of proof as to negligence, the court need not determine whether there was any knowledge or privity on the part of Oakland, the Vessel's owner.

10. The court holds that Petitioner is exonerated from all claims of liability. The Clerk of the Court is directed to enter judgment in favor of Reel Action Charters, Inc. and to close the file in this case.

SO ORDERED.

/s/ Leonard D. Wexler
LEONARD D. WEXLER
UNITED STATES DISTRICT JUDGE

Dated: Central Islip, New York
September 27, 2006